The undersigned have reviewed the Award based upon the record of the proceedings before the deputy commissioner.
The appealing party has shown good grounds to reconsider the evidence. Upon reconsideration of the evidence as a whole, the undersigned reach different facts and conclusions from those reached by the deputy commissioner. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their own findings of fact, conclusions of law, and ultimate Award. Accordingly, the January 9, 1998, Opinion and Award is HEREBY VACATED.
The Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement which was filed on February 14, 1997 and is hereby incorporated by reference, and at the initial hearing, as
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case. The parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Aetna Casualty and Surety was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. The issues for determination are:
 a. To what benefits may the plaintiff be entitled under the Act as a result of the injury by accident arising out of and in the course of her employment, which she sustained on April 26, 1994?
 b. Whether the plaintiff's herniated cervical disc was causally related to the incident on April 26, 1994.
3. What is plaintiff's average weekly wage?
5. The parties stipulated seventeen pages of medical reports into the record.
 ***********
Based upon all of the competent, credible, and convincing evidence adduced from the record and the reasonable inferences drawn therefrom, the undersigned make the following additional
 FINDINGS OF FACT
1. On April 26, 1994, the plaintiff was employed with the defendant-employer as a realtor. She was a fifty-four year old female, with a medical history of treatment for rheumatoid arthritis since 1972. The plaintiff had been treated for this condition by Dr. Gordon Senter, a rheumatologist.
2. The plaintiff's duties included inspecting and touring homes listed with the defendant-employer, listing residential real estate for sale, taking prospective buyers to homes, and selling homes.
3. The plaintiff was not on a salary, and her income consisted of commissions. Gross commissions are normally based on 6% of the sales price of the property, of which the employer-defendant is paid a portion and the real estate person (plaintiff) is paid a portion. The commission is normally split 50-50 between the real estate company which listed the house for sale and the real estate company which actually sold the house to the buyers. In the event the plaintiff was both the listing agent and the selling agent, then she would receive two commissions for the sale of the same property, that is part of the one-half of the commission as the listing agent and part of the other one-half of the commission as the selling agent. In some cases the plaintiff listed the property and months later, the property was sold by another agent and commissions were paid when the properties closed. In addition, in this case, the plaintiff did not begin work until October 13, 1993, took a vacation in November of 1993, and engaged in training classes the balance of 1993. Thus, due to the unique nature in which plaintiff earned her wages, the results would not be fair and just to both parties to include the number of weeks in 1993 from October 13, 1993 to December 31, 1993, in which plaintiff earned no income.
4. Plaintiff was employed with defendant-employer for less than 52 weeks prior to her injury. Further, she was employed on a straight commission payment schedule in which she listed certain properties prior to the injury which were sold by another realtor after her injury and where the plaintiff was able to procure a contract between parties prior to her date of injury but for which closings occurred afterwards. Due to the unique nature of real estate commission sales, it takes time when one begins work to obtain listings or sales. Finally, use of a similarly situated real estate agent's average weekly wages for the fifty-two weeks prior would produce unfair or unjust results due to each person's unique sales ability and its relation to commission sales.
5. From January 1, 1994 through March 21, 1994, a twenty-eight (28) week period which is fair and just to both parties, plaintiff earned $19,940.53. This amount, when divided by that twenty-eight week period, constitutes a fair and just average weekly wage of $712.16, which results in a weekly compensation rate of $466.00, the maximum compensation rate for the year of 1994.
6. On April 26, 1994, the plaintiff was inspecting a home with co-workers, when she slipped and fell on wooden steps on the home's deck. The plaintiff struck her head on one step as she fell.
7. Immediately following the fall, the plaintiff experienced upper body pain, head pain, and pain in both arms. The plaintiff lay on the deck for a short time, during which her pain subsided. The plaintiff worked the rest of the day.
8. Following her injury, the plaintiff continued having pain on the left in her scapula area and on the back of her left arm in the triceps area, but she was taking pain medication for her rheumatoid arthritis, including aspirin 2-3 times a day, which she increased after the fall. The plaintiff did not go to the doctor immediately because she has lived with pain from rheumatoid arthritis for over 20 years and was on anti-inflammatory medicine and aspirin at the time of the fall, following which she did increase the dosage to deal with the pain from the fall. The plaintiff kept the pain under control with her arthritis medicine until she could not longer handle it and sought help from Dr. R. Gordon Senter, her treating rheumatologist. Dr. Senter's June 10, 1994, office note did not mention neck pain, nor did he recall plaintiff mentioning pain in that region but refers to a flare up of "arthritis" going back to March.
9. In July of 1994, the plaintiff began to experience tension and discomfort in her neck, for which she sought treatment on July 8, 1994, at the emergency room of Presbyterian Hospital in Charlotte, On July 9, 1994, the plaintiff was seen by Dr. Stephanie Glenn of the Nalle Clinic Urgent Care Center in Charlotte.
10. Dr. Senter's office note of July 11, 1994, referred to the Presbyterian Hospital and the visit to the Nalle clinic where she was given shots and muscle relaxants for "shoulder pain radiating down the left arm." On July 26, 1994, the plaintiff returned to see Dr. Senter for "pain in her upper back and down the back of her left arm" and told Dr. Senter about seeing a chiropractor for the problem. Dr. Senter noted that the pain was "around her left scapula and down the back of her left arm," and he specifically noted that her "neck itself is not painful or tender" but "[w]hen we put the neck through Rom, particularly hyperextending and certain other movements, she will get some pain that goes down the back of her left arm and around the scapula on the left." Dr. Senter's impression on July 26, 1994 was that plaintiff had a C7 or C8 nerve root compression on the left causing the problem. Dr. Senter put in his office notes and testified at his deposition that the fall on April 26, 1994, at work where the plaintiff hit the back of her head on the bottom step "could have and probably did cause the [herniated] disk" in her neck.
11. The plaintiff was referred to Dr. Bob W. Brawley of Charlotte Neurological Associates by Dr. Senter on August 1, 1994, and she was initially seen on August 4, 1994, when Dr. Brawley noted that plaintiff had had several bouts of interscapular pain in the past which had been treated with steroid injections. She had never had any arm pain with those prior incidents, but she had had left arm pain with numbness in the index and middle fingers on August 4, when she saw Dr. Brawley. Dr. Brawley's physical examination included hyperextension of plaintiff's neck, which produced "pain in her left shoulder and arm." Dr. Brawley recommended surgery, which plaintiff was reluctant to do at that time. Therefore Dr. Brawley prescribed Prednisone.
12. On August 24, 1994, the plaintiff had a CT scan done at Presbyterian Hospital of her neck, which showed a large central and left-sided herniated disc at the C6-7 level.
13. On September 7, 1994, the plaintiff obtained a second opinion on surgery from Dr. David N. DuPuy of Charlotte Orthopedic Specialists, where he noted that "[t]here is almost no neck pain." However, Dr. Dupuy's review of the CT Scan revealed a large central herniated disc, C6-7, on the list. It should be noted that the competent, credible, and convincing evidence from Dr. Senter and eventually from Dr. Brawley show that a herniated disc at C6-7 will normally not produce neck pain but will produce left shoulder pain radiating into the left arm which are symptoms that Mrs. Lisk had from the time of the April 26, 1994 fall.
14. On October 28, 1994, the plaintiff called Dr. Brawley and asked for the neck surgery due to the pain in her shoulder and arm. On November 3, 1994, Dr. Brawley performed surgery at Presbyterian Hospital on the plaintiff's neck, which was a C6-7 foraminotomy and discectomy.
15. On November 22, 1994, the plaintiff saw Dr. Brawley, who noted that "[t]he pain and numbness in her (left) arm is [sic.] gone" and that she had a left triceps reflex, which had been diminished and weak when he first saw her on August 4, 1995. Dr. Brawley released her from his care on January 30, 1995, with "some neck pain which is to be expected." He gave her a 5% permanent partial disability to her neck (back).
16. Dr. Senter, as previously noted, has provided competent, credible and convincing causal connection between plaintiff's compensable April 26, 1994 fall and her resulting herniated disc. Dr. Brawley originally testified at his deposition that plaintiff's fall did not cause her herniated disc. However, he later responded to a hypothetical question that if plaintiff's true history was of a fall and the immediate onset of paresthesias shooting through her body, then there would be no question in his mind that the accident caused the ruptured disc. Deputy Commissioner Dollar never made any specific credibility finding concerning plaintiff. Plaintiff's given history of the immediate onset of upper body pain, head pain and pain in both arms which was vibrating like a "twanged guitar string" is credible and convincing, despite Dr. Brawley not getting this detailed history directly from the plaintiff. Thus, the Full Commission find both Dr. Senter's testimony and Dr. Brawley's testimony sufficient, credible and convincing as to establishing the causal connection between plaintiff's April 26, 1994, fall and the resulting herniated disc in her neck.
17. As a result of the accident at work on April 26, 1994, the plaintiff's left arm is still weak in that it is still difficult for her to lift with her left arm or to unlock a door. She retains the 5% permanent partial disability to her back (neck). The plaintiff never perceived pain in her neck area, even to the day of surgery. Instead, she felt pain across her shoulders, under her left shoulder blade, and in her left arm, which was transferred pain from the compression of a nerve root due to the compensable herniated disc in her neck, which was caused by the fall at work on April 26, 1994.
18. The plaintiff continued working after the accident until the pain became unbearable. She was out of work for the stipulated period of time from July 8, 1994 through December 15, 1994. This period of absence was due to the medical treatment received for injuries suffered in her compensable fall of April 26, 1994. The plaintiff received no income from November 17, 1994, when a commission was paid on the Herrin Avenue property she had listed on May 2, 1994, until she was paid a commission on April 29, 1995. However, her wage earning capacity had returned upon her actual return to work on December 15, 1994, which was actually prior to her release and rating by Dr. Brawley on January 30, 1995.
19. Future medical treatment will be necessary for plaintiff's neck injury to provide the plaintiff with needed relief from pain.
20. Plaintiff's attorney has a signed fee contract with plaintiff for a one-third contingency fee. The undersigned find this fee requested to be unreasonable based upon the facts of this case and the level of difficulty. The normal and customary fee requested and awarded for an appeal through the Full Commission level for attorneys of similar skills and involving a similar number of depositions and preparations as those undertaken by plaintiff's counsel currently remains at twenty-five percent. Thus, plaintiff counsel's fee contract is found to be unreasonable in this case, and a reasonable attorney's fee is deemed to be twenty-five percent of the compensation due plaintiff.
 ***********
The foregoing stipulations and findings of fact engender the following additional
 CONCLUSIONS OF LAW
1. On April 26, 1994, plaintiff sustained a compensable injury by accident arising out of and in the course of the plaintiff's employment when the plaintiff slipped and fell on a damp wooden deck; and the back of her head struck a step, which caused a herniated disc in her neck and resultant radiating shoulder blade and left arm pain. G.S. § 97-2(6).
2. Plaintiff's average weekly wages were $712.16, yielding a weekly compensation rate of $466.00, the maximum compensation rate for the year of 1994. G.S. § 97-2(5).
3. As a result of her compensable injury, the plaintiff is entitled to compensation for temporary total disability from July 8, 1994 to December 15, 1994. Such amount, having accrued, shall be paid in a lump sum, subject to plaintiff's attorney's fees. G.S. § 97-29.
4. Plaintiff sustained a five percent (5%) permanent partial disability of the plaintiff's neck (back) and is entitled to 15 weeks of compensation for said impairment G.S. § 97-31 (23).
5. Plaintiff is entitled to the payment of all medical expenses incurred or to be incurred as a result of her compensable injury. G.S. § 97-25.
6. Plaintiff's counsel is entitled to a reasonable attorney's fee of twenty-five percent (25%) of the amounts due plaintiff. G.S. § 97-90.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the undersigned enter the following
 AWARD
1. Defendants shall pay to plaintiff temporary total disability compensation in the amount of $466.00 per week, for the period of time from July 8, 1994 through December 15, 1994. Said amount, having accrued, shall be paid in a lump sum, subject to the attorney's fee awarded below.
2. Defendants shall pay to plaintiff permanent partial disability based upon the 5% rating of her back, a period of fifteen weeks based upon the weekly compensation rate of $466.00. This amount shall be paid in a lump sum, subject to the attorney's fee awarded below.
3. Defendants shall deduct from the above amounts due plaintiff twenty-five percent (25%) and shall pay said amount to plaintiff's counsel as a reasonable attorney's fee for services rendered.
4. Defendants shall pay all medical expenses incurred or to be incurred as a result of plaintiff's compensable injury, once bills for the same have been submitted through the carrier for approval, provided said treatments are reasonably necessary to effect a cure, give relief, or lessen plaintiff's period of disability.
5. Defendants shall pay the costs.
The case is HEREBY REMOVED from the Full Commission hearing docket.
This the ___ day of _________, 1998.
 S/_________________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/______________________ BERNADINE S. BALLANCE COMMISSIONER
S/______________________ CHRISTOPHER SCOTT COMMISSIONER